March 13, 2019

**Supreme Court**

No. 2017-48-Appeal.
(P 15-188M)

Colleen MacTavish-Thurber  :

v.  :

Timothy Gauvin.  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Colleen MacTavish-Thurber          :

v.                                 :

Timothy Gauvin.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The plaintiff, Colleen MacTavish-Thurber,[1] appeals a

Family Court order denying a miscellaneous petition filed pursuant to G.L. 1956 §§ 15-5-24.1

and 15-5-24.3 for grandparent visitation with two children of her daughter, who is deceased, and

the defendant, Timothy Gauvin.  This case came before this Court for oral argument on January

17, 2019, pursuant to an order directing the parties to appear and show cause why the issues

raised in this appeal should not summarily be decided.  After hearing the arguments of counsel

and examining the memoranda filed on behalf of the parties, we are of the opinion that cause has

not been shown, and we proceed to decide the appeal at this time without further briefing or

argument.  For the reasons set forth in this opinion, we affirm the order of the Family Court.

---

[1] Although the Family Court's decision lists the plaintiff's first name as Stacy, the lower court file and the statements filed with this Court refer to her as Colleen.  Additionally, throughout this opinion, we use pseudonyms to identify the two minor children to protect their privacy.

# I

## Facts and Travel

The plaintiff is the maternal grandmother of two minor children: Danielle, who was born in May 2006, and Adam, who was born in September 2007.  The defendant is the biological father of both children, and he was previously married to plaintiff's daughter.  The defendant testified that there had been a filing for divorce and he had full custody of the children.  However, in December 2010, before the divorce became final, the mother of Danielle and Adam died after she was shot by law enforcement during the course of a bank robbery in Florida.

In April 2015, plaintiff filed a miscellaneous petition in the Providence County Family Court in which she sought grandparent visitation with her grandchildren, Danielle and Adam.  Specifically, her petition averred that for more than thirty days she had made repeated attempts to see her grandchildren, but that defendant had refused her visitation requests.  The plaintiff further claimed that, without court intervention, she would not be able to visit her grandchildren and that defendant's refusal to allow her to visit with them was unreasonable.  She alleged that it was in the best interests of the grandchildren to allow her to visit with them and that she was a fit and proper person to exercise visitation rights.

The petition eventually was heard before a justice of the Family Court, and plaintiff, defendant, and defendant's current wife, Sarah Gauvin, all testified.  The plaintiff testified that, in September 2010, her daughter separated from defendant, her husband, and left the marital domicile.  Because defendant was left with the couple's two children, and due to his work schedule, plaintiff agreed to care for Danielle and Adam on the weekends.[2]

---

[2] The plaintiff testified that, from September 2010 to February 2011, the children would also have dinner at her house during the week when defendant was working.

Danielle and Adam were informed of their mother's death in February 2011, when they were just four and three years old, respectively. According to plaintiff, she and defendant agreed to tell Danielle and Adam that their mother had passed away as a result of a motor vehicle accident because "the children were too young at that time to understand and take on that she was shot in the head and died on the street in Florida." She testified that, as soon as defendant informed her that the children had been told of their mother's death, she dedicated a tree in her backyard to her deceased daughter and sprinkled her daughter's ashes on the tree at a time when Danielle and Adam were present.

The plaintiff further testified that, beginning in 2012, she was spending less time with Danielle and Adam, and her time with her grandchildren diminished even more when defendant and his current wife, Sarah Gauvin, married. According to plaintiff, she did not have a good relationship with defendant's new wife, and she felt that "there was always resistance."

The plaintiff testified that in 2015 she saw Danielle and Adam in January, February, and March, but that the March 2015 visit was the last time she saw them.[3] According to plaintiff, defendant contacted her in March 2015 to set up a meeting to discuss behavioral issues that the children were experiencing, but the meeting never occurred.

The plaintiff also testified that, in March and April 2015, she tried to contact defendant so that she might see the children, but that defendant failed to return her messages. She said that she would leave two to three—and she admitted maybe one time, four—messages per day, two to three times per week. She also testified that her husband may have once left a voicemail message for defendant around 6:00 am. The plaintiff reported that she received one response

---

[3] Introduced as evidence during the petition hearing were photographs of the children at plaintiff's house, taken during the January 2015 visit. In the photos, plaintiff contends that the children appear to be cheerful and content.

from defendant, informing her that the children did not want to speak to her, but she nonetheless continued to leave voice and text messages.

The plaintiff testified that she had no idea why defendant had become angry with her. She further testified that she believed it would be possible to rekindle a relationship with defendant, but that first she had to be reintroduced to the children. She acknowledged that defendant is a good and fit parent for Danielle and Adam.

The defendant was next to testify. He said that, although plaintiff never babysat the children before their mother's death, she "had [his] side" during the divorce and she put the best interests of the children over her own daughter's interest. The defendant also testified that he waited until February 2011 to inform the children of their mother's passing. He said that his decision in that regard was founded on the fact that the incident resulting in his former wife's death occurred just before Christmas, and he "wanted to make sure that [he] had a period of time that [he] could spend with them" when he was not working and they were not in school or daycare.[4] The defendant testified that plaintiff wanted to inform Danielle and Adam of their mother's death immediately, but that eventually she agreed with his reasoning. Eventually, however, defendant told the children the truth about how their mother had been killed because he "didn't want them thinking that their mother was this fictitious great person that their grandmother was saying she was." The defendant also testified that, at some point, plaintiff had invited him to participate in the sprinkling of her daughter's ashes on the tree in her backyard with the children, but that he did not go because he was working at that time.

In July or August 2012, defendant began his relationship with the woman who would become Mrs. Gauvin. The couple began living together in November 2012, and they eventually

---

[4] The plaintiff testified that defendant did not believe the children needed counseling at the time that they were informed of their mother's death.

married in August 2013.[5] The defendant testified that plaintiff started spending less time with the children around this time because he and Mrs. Gauvin worked opposite schedules so one of them would always be at home to take care of the children.[6]

The defendant further testified that, at some point, Danielle and Adam were having behavioral issues at school and at home, and that those issues "always occurred after visits with their grandparents." As a result, Adam began seeing a counselor at school, starting in November 2014, in an effort to address his issues. The defendant also described that, after visiting with plaintiff, the children "would come home with huge bags under their eyes" signaling a lack of sleep, and that sometimes they would come home sick with symptoms such as diarrhea and vomiting.

Starting in 2014, defendant allowed the children to decide whether or not they wished to visit, not only with plaintiff, but also with his own mother and Mrs. Gauvin's parents.[7] After the March 2015 visit with plaintiff, defendant testified that Adam came home "balling [*sic*] his eyes out" because plaintiff had shown their mother's ashes to the children that day. Adam told his father that the display of the ashes frightened him. Adam also described to his father what the ashes looked like and how he, Danielle, and plaintiff had sorted through his mother's belongings.

Furthermore, in that same month, Adam needed to see the school nurse and a physician because he had a pulse rate of 200 beats per minute. Even though Adam had had a history of an elevated heartbeat as an infant, he had not exhibited such symptoms for several years.

---

[5] The couple also had a child together, who was just over a year old at the time of the hearing on plaintiff's petition.

[6] The defendant testified that his own mother would also care for Danielle and Adam on alternate weekends before his remarriage; he said that his own mother's time with the children had also diminished since his remarriage.

[7] There was testimony presented to the Family Court that defendant also allowed the children to decide whether they wanted to attend church and that the children had gone to church with Mrs. Gauvin.

Additionally, defendant testified that, after the March 2015 visit, Adam would wake up afraid that plaintiff was "coming to get him in the middle of the night[,]" that he feared being shown the ashes, and that he repeatedly heard a song from a music box that once belonged to his mother. According to defendant, he never had a discussion with plaintiff that gave her permission to show the children their mother's ashes on that day, and displaying their mother's ashes to the children was the "final nail" after several disagreements and arguments about what the children should and should not be doing while they were at plaintiff's home.[8]

According to defendant, since the March 2015 visit, he prevented plaintiff from visiting with Danielle and Adam because they did not wish to see her. The defendant testified that he believed that showing the mother's ashes to Adam was "incredibly inappropriate" and that it had been mentally damaging to Adam. The defendant also said that, after the last visit, he was barraged with phone calls and voicemail messages from plaintiff and her husband and that he had contacted the police because he considered the phone calls to be a form of harassment. Since that point, defendant testified, the phone calls had ceased.

In stark contrast to plaintiff's testimony, defendant testified that he believed that the children should not visit with plaintiff again. He said that Adam's behavior had improved "insanely" since the cessation of visitation, that there were rarely any issues at home or school, that his grades were "phenomenal," that his teacher gave great progress reports, and that both children were on a regular routine with homework and their sleep. The defendant also conveyed that Adam stopped seeing the school counselor in June 2015, a few months after the visits with plaintiff came to an end.

---

[8] The defendant also testified that he was not solely relying on his children's descriptions with respect to "what was lacking at [plaintiff's] house[,]" but had spoken to plaintiff about these incidents as well.

Mrs. Gauvin was the last to testify. She said that she noticed a change in the children's behavior at "the very end of 2012, beginning of 2013[,]" and that Adam in particular would have behavioral issues when they would return home from plaintiff's house. She further testified that the children had never showcased those behaviors before that time. Moreover, after the last visit with plaintiff, Mrs. Gauvin testified, the children had not demonstrated any behavioral issues.

A report from a Family Court investigator was accepted into the record. The investigator had interviewed plaintiff, her husband, defendant, Danielle, and Adam. He also reviewed several documents, including reports from Adam's visits with the school counselor and his cardiac physician, a police report from a minor incident between the parties, school communications, and information concerning the death of the children's mother. Ultimately, the investigator recommended that Danielle and Adam should have no further visitation with plaintiff, basing his conclusion "directly on the interviews of the children expressing that they disliked visiting with their grandmother as well as with respect to the reports from the school social worker as well as the wishes of their [f]ather." The investigator observed that "the children have suffered enough stress with the loss of their mother and that they are happy and healthy with their father and step[]mother."

The Family Court investigator also addressed the report authored by Adam's school counselor. In that report, the school counselor said that she started seeing Adam in November 2014 after a behavioral incident that had occurred at the school playground. She also noted that she had spoken with Adam's parents and they had informed her of his "frequent meltdowns[.]" Specifically, she recounted how, in April 2015, Mrs. Gauvin told her about a recent visit that Adam had had with his maternal grandmother when he was shown his mother's ashes and the negative impact it had had on both children. The school counselor also reported that when she

discussed that visit with Adam "he appeared to be upset as evidenced by a change in his facial expressions and a decrease in his level of engagement[.]" She confirmed that Adam's visits with plaintiff were affecting the boy negatively, and she also reported that Adam was afraid that plaintiff could "come over and take him" while he was at home or at school. The school counselor recommended that any future visits with Adam and plaintiff be supervised by the parents and be in a neutral location. She made this recommendation contingent, however, on plaintiff "stopping all of the harassing type behavior that has reportedly been taking place."

After the hearing, the hearing justice rendered a written decision in November 2016. Upon considering the testimony of plaintiff, defendant, and Mrs. Gauvin, as well as the evidence presented at the hearing and the Family Court investigator's report, the court found that plaintiff had satisfied her burden under § 15-5-24.3 of showing that she had made repeated attempts to visit the children for thirty days prior to the time she filed her petition. Also, the hearing justice concluded that plaintiff had proven there was no other way under the present circumstances that she would be able to visit the children without court intervention. However, the court also found that plaintiff was not a fit and proper person to have visitation rights with Danielle and Adam, that plaintiff had failed to prove, by clear and convincing evidence, that defendant's decision to refuse visitation was unreasonable, and that it was in the children's best interest not to visit with plaintiff. The plaintiff timely filed a notice of appeal to this Court.[9]

---

[9] We note that, initially, no final judgment was entered in the Family Court. Following the prebriefing conference, this Court remanded the case to the Family Court for entry of final judgment in accordance with Rule 58(a) of the Family Court Rules of Domestic Procedure. On remand, an order entered in the Family Court in May 2018, which denied plaintiff's petition for grandparent visitation. The papers were then returned to this Court in October 2018.

## II

## Standard of Review

In cases on review for grandparent visitation, we consider the "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel v. Granville*, 530 U.S. 57, 69 (2000). "[T]he decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance." *Id.* at 70. "[I]f a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* We review a hearing justice's decision whether to award grandparent visitation under an abuse-of-discretion standard. *See Puleo v. Forgue*, 634 A.2d 857, 858 (R.I. 1993).[10] Moreover, "the findings of a [hearing] justice will not be disturbed on appeal unless the [hearing] justice misconceived or overlooked material evidence or was otherwise clearly wrong." *Id.*

## III

## Discussion

On appeal, plaintiff argues that the Family Court's decision contradicts the evidence presented at the hearing because many of the facts that the hearing justice purportedly erred in evaluating "were actually the result of [defendant] sharing his opinion and [were of] no independent evaluation or recommendation regarding the children." She contends that she proved, by clear and convincing evidence, that defendant's decision to deny her grandparent

---

[10] We note that the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57 (2000), recognized that Rhode Island's statute governing grandparent visitation was in compliance with its holding. *See Troxel*, 530 U.S. at 70 (citing G.L. 1956 § 15-5-24.3(a)(2)(v)). For that reason, the mere fact that *Puleo v. Forgue*, 634 A.2d 857 (R.I. 1993)—a case where this Court reviewed a grandparent visitation decision under § 15-5-24.3—was decided before *Troxel* is of no moment and correctly provides our standard of review here.

visitation was unreasonable. She also argues that she presented evidence that she was a fit and proper person to have visitation.

Section 15-5-24.1 states that the Family Court "may, upon miscellaneous petition of a grandparent whose child is deceased, grant reasonable visitation rights of the * * * grandchildren to the grandparent, whether or not any divorce or custody proceedings were ever commenced, and may issue all necessary orders to enforce visitation rights."[11] Furthermore, § 15-5-24.3 states, in pertinent part:

> "(a)(1) The family court, upon miscellaneous petition of a grandparent for visitation rights with the petitioner's grandchild, and upon notice to both parents of the child, and after a hearing on the petition, may grant reasonable rights of visitation of the grandchild to the petitioner.
>
> "(2) The court, in order to grant the petitioner reasonable rights of visitation, must find and set forth in writing the following findings of fact:
>
> "(i) That it is in the best interest of the grandchild as determined on a case-by-case basis that the petitioner is granted visitation rights with the grandchild.
>
> * * *
>
> "(ii) That the petitioner is a fit and proper person to have visitation rights with the grandchild;
>
> "(iii) That the petitioner has repeatedly attempted to visit his or her grandchild during the thirty (30) days immediately preceding the date the petition was filed and was not allowed to visit the grandchild during the thirty-day (30) period as a direct result of the actions of either, or both, parents of the grandchild;

---

[11] In addition to §§ 15-5-24.1 and 15-5-24.3, plaintiff also alleges that she filed her petition pursuant to § 15-5-24.2. That statute is titled "Visitation rights of grandparents whose child is denied or has failed to exercise rights" and allows the Family Court, upon petition by a grandparent, to grant reasonable visitation rights to that grandparent during "any divorce proceeding" when the grandchild is a child of the marriage. Here, the petition was not filed during a divorce proceeding. For this reason, we note that § 15-5-24.2 is inapplicable to the case before us, and that plaintiff's petition was properly filed under §§ 15-5-24.1 and 15-5-24.3.

"(iv) That there is no other way the petitioner is able to visit his or her grandchild without court intervention; and

"(v) That the petitioner, by clear and convincing evidence, has successfully rebutted the presumption that the parent's decision to refuse the grandparent visitation with the grandchild was reasonable."[12]

We have held, in citing with approval to the United States Supreme Court's decision in *Troxel*, that "a party who seeks visitation with a child must 'overcome the otherwise applicable presumption in favor of honoring a fit custodial parent's determination not to allow such visitation.'" *Resendes v. Brown*, 966 A.2d 1249, 1254 (R.I. 2009) (alteration omitted) (quoting *Rubano v. DiCenzo*, 759 A.2d 959, 968 (R.I. 2000)); *see also Keenan v. Somberg*, 792 A.2d 47, 50 n.2 (R.I. 2002) ("The law's concept of the family rests on a presumption that parents possess

---

[12] We note that, subsequent to the hearing justice's decision, the General Assembly amended § 15-5-24.3 to include factors that the hearing justice shall consider when determining whether it is in the best interest of the grandchild to have visitation with the grandparent, and deleted a requirement that notice be given to the child. *See* P.L. 2017, ch. 222, § 1; P.L. 2017, ch. 334, § 1. Although it does not impact our decision in this case, those factors include, but are not limited to, the following:

"(A) The nature of the relationship between the child and the grandparent seeking visitation;

"(B) The amount of time the grandparent and child spent together;

"(C) The potential detriments and benefits to the child from granting visitation;

"(D) The potential effect of granting visitation on the parent-child relationship;

"(E) The preferences of the grandchild who is of sufficient intelligence, understanding, and experience to express a preference; and

"(F) The reasons that the parent(s) believe that it is not in their child's best interests to have visitation with the grandparent(s)[.]" Section 15-5-24.3(a)(2)(i).

what a child lacks in maturity, experience, and capacity and that natural bonds of affection lead parents to act in the best interests of their children.") (deletion and alteration omitted) (quoting *Troxel*, 530 U.S. at 68). Here, plaintiff admitted in her testimony below—and there was no evidence presented to the contrary—that defendant is a fit custodial parent.[13] Therefore, plaintiff had the burden of proving, "*by clear and convincing evidence*, [that she] has successfully rebutted the presumption that [defendant's] decision to refuse the grandparent visitation with [Danielle and Adam] was reasonable." *See* § 15-5-24.3(2)(v) (emphasis added).

We are satisfied that the hearing justice did not abuse his discretion in denying plaintiff's petition for grandparent visitation. In his eight-page written decision, the hearing justice reviewed the testimony of all three witnesses as well as the report by the Family Court investigator. He observed that the investigator's report concluded that the children had no interest in visiting with plaintiff, and he also considered the investigator's observation that, in the hearing justice's words, the children "are happy and healthy with their father and stepmother" as well as the investigator's recommendation that "[p]laintiff have no further visitation with the children in this matter."

---

[13] The plaintiff testified as follows before the Family Court at the hearing on her petition for grandparent visitation:

> "Q Is this a true statement: You have no doubt that [defendant] desires a good life for his children?
>
> "A Yes.
>
> "Q Is it fair to say that his greatest strength has been his concern for the children's welfare and his ability to financially support them sufficiently over the years; is that a fair statement?
>
> "A Yes."

Moreover, the hearing justice considered defendant's testimony concerning the detrimental impact that the visits with plaintiff had had on the children and the fact that neither he nor the children wished to continue visits with plaintiff at that time.[14] He also recounted, from the testimony by defendant and Mrs. Gauvin, how the children's behavior, performance in school, and health had improved since the visits with plaintiff had come to an end. These findings, when combined with the presumption that defendant, as a fit parent, was acting in Danielle and Adam's best interest, leads us to conclude that the hearing justice was correct when he denied grandparent visitation rights. *See Keenan*, 792 A.2d at 50; *Puleo*, 634 A.2d at 858. The plaintiff has not offered any compelling legal argument as to why this Court should hold otherwise. It is our opinion, therefore, that the hearing justice was well within his discretion when he denied plaintiff's petition for grandparent visitation with Danielle and Adam.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the order of the Family Court. The papers in this case shall be remanded to that tribunal.

---

[14] The hearing justice also noted similarities between defendant's testimony and the school counselor's report regarding the negative impact that the visits had on Adam.

Justice  Independence  Honor

JUDICIARY

RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Colleen MacTavish-Thurber v. Timothy Gauvin. |
| **Case Number** | No. 2017-48-Appeal. (P 15-188M) |
| **Date Opinion Filed** | March 13, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice John E. McCann, III |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Jennifer Hoopis D'Ambra, Esq. <br> For Defendant: <br><br> Joseph E. Marran III, Esq. |